FILED
COURT OF APPEALS
DIVISION II

2015 JUN 23 AM 8: 31

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 45607-9-II |
| Respondent, | |
| v. | |
| GEORGE THOMAS STRANGE, | UNPUBLISHED OPINION |
| Appellant. | |

JOHANSON, C.J. — George T. Strange appeals his jury trial convictions for one count of second degree child molestation and one count of voyeurism. He argues that (1) his right to a fair trial by an impartial jury was violated, (2) his trial counsel was ineffective because counsel failed to object to the admission of irrelevant and improper opinion testimony, and (3) his right to a unanimous jury verdict on the second degree molestation charge was violated because the trial court did not give a *Petrich*[1] instruction. We hold that Strange received a fair trial because his jury was impartial, Strange's trial counsel's decision to not object to a video of Strange's police interview was a legitimate trial tactic, and Strange was not entitled to a *Petrich* instruction because the State relied on only one act of molestation. Accordingly, we affirm the convictions.

---

[1] *State v. Petrich*, 101 Wn.2d 566, 683 P.2d 173 (1984).

FACTS

From 2011 to 2013, Strange lived with his wife and his wife's children. J.M. was 12 years old when, one night, Strange came into her bedroom to tuck her in as he usually did. However, according to J.M., Strange "asked to give [her] a -- a breast exam." 1B Report of Proceedings (RP) at 224. Strange told J.M. that he was trying to help her learn how to detect cancer. Strange and J.M. had not discussed breast cancer or breast exams before. But Strange lifted J.M.'s shirt and spent three to five minutes touching both of her breasts. When Strange thought that J.M.'s mother had returned home, he stopped and told J.M. not to tell her mother what had happened.

One morning after this event, J.M. woke up to find Strange looking down and into her shorts. At some point while J.M. was sleeping, Strange had come into her bedroom and used his hands to lift her shorts and underwear so that he could look into her shorts and at her genitals. J.M. pretended to be asleep, rolled over in bed, and Strange left the room.

In October 2013, the State charged Strange with one count of second degree child molestation[2] and one count of voyeurism.[3] During voir dire, the court and counsel asked the prospective jurors, among other things, about their personal experiences with child molestation. Although most of the jurors had no personal experience with child molestation, almost one-third of the jurors knew someone who was either a victim or had been charged with child molestation. In response to the court's questioning, juror no. 54 stated,

> JUROR: Um -- what I said before, like, I know people that I know. Like it's not an easy accusation to make. Like, it is hard for people (inaudible). It's like if accusations were made there's something behind that.

---

[2] RCW 9A.44.086.

[3] RCW 9A.44.115(2)(a).

[JUDGE]: Okay. So, let me ask you this, . . . I mentioned this earlier that -- we talked about the presumption of innocence. That a person that's charged with a crime is -- is presumed innocent and that presumption continues throughout the entire trial. Is that something that you think you could use and implement that -- that presumption of innocence throughout the entire trial starting now going forward?

JUROR: I don't -- like, I don't have a ton of experience but it has just been my experience people don't make that accusation, you know, for no reason. Like, I feel like if an accusation was made there had to be something that had happened.

1A RP at 72. Juror no. 54 was excused for unrelated hardship reasons.

J.M. testified at trial about Strange's actions consistently with the above narrative. In addition, she testified that when Strange would give her massages, he occasionally "touch[ed] [her] butt." 1B RP at 241.

J.M. worked at the restaurant that her mother owned. J.M.'s mother, her brother, and Johnathan Layman, who also worked at J.M.'s mother's restaurant, testified about Strange's behavior around J.M. J.M.'s mother testified that Strange spent more time with J.M. and that he was often aggressive, pulling J.M. into his lap and holding onto her and hugging her. J.M.'s brother stated that Strange wanted to buy J.M. thong underwear and that he often spent at least 15 to 30 minutes in J.M.'s bedroom at night tucking her in. Layman testified that Strange would occasionally visit J.M. at work. He explained some of Strange's behavior, including his expectation that J.M. would kiss him on the lips when he came in and hugging J.M. from behind so that he could place his hands under her breasts.

Detective Todd McDaniel also testified and the State played a video of Detective McDaniel's interview with Strange prior to his arrest. Strange did not object to playing the video or admitting it into evidence. In the interview, Detective McDaniel confronted Strange about J.M.'s accusations of "inappropriate touching of [her] breasts" and "looking like down her pants

3

one time while she was sleeping." 1C RP at 362. Strange admitted that he performed the breast exam on J.M., but insisted that she had asked him to do it. He also denied ever looking down J.M.'s pants at her genitals. Strange said that because he had gone to nursing school, he "approach[ed] things in a very medical manner" and his intentions with the breast exam were not sexual. 1C RP at 364. Detective McDaniel also asked Strange if, when he tucked J.M. in at night, he would ever touch her buttocks and "she would roll over," presumably so he would leave. 1C RP at 371. Strange insisted that this did not happen.

In trying to get Strange to open up about his relationship with J.M., Detective McDaniel was at times aggressive in his questioning. After Detective McDaniel asked Strange if he thought that his "behavior was appropriate," Strange told him that he thought helping his daughter to learn how to perform a breast exam was "what any father would do." 1C RP at 397. Detective McDaniel disagreed and responded, saying that "we know better than that and you're -- you're trying to feed me a line . . . of baloney." 1C RP at 398-99. Strange conceded that maybe "[l]ooking at it back, hindsight, yeah, maybe I shouldn't have done it." 1C RP at 399. Detective McDaniel agreed and said, "[S]o I think you're giving out certain details just to make your story better" and that "usually [the truth]'s a little somewhere in the middle." 1C RP at 399.

Finally, Karen Joiner, who is Strange's former nursing school instructor as well as the Dean of Instruction and Director of Nursing at Lower Columbia College, also testified. Joiner testified that in the one semester that Strange was in nursing school, he would never have learned how to do a breast exam and that breast exams are, traditionally, not necessary for children.

Strange did not call any witnesses nor did he testify. The jurors were instructed that they "are the sole judges of the credibility of each witness. [They] are also the sole judges of the value

4

or weight to be given to the testimony of each witness." Clerk's Papers at 20. Neither party requested a *Petrich* instruction and the court did not give one. The jury convicted Strange on both counts. Strange appeals his convictions.

## ANALYSIS

### I. JURORS' COMMENTS DID NOT TAINT THE JURY VENIRE

Strange argues that his right to a fair trial by an impartial jury was violated because of prospective jurors' statements concerning their own prior experiences with child molestation, either in their families or among friends or acquaintances, which tainted the entire jury venire. Strange's sole argument is that this case is factually similar to *Mach v. Stewart*, 137 F.3d 630 (9th Cir. 1997). We disagree.

The Washington Constitution guarantees a criminal defendant the right to a fair trial by "unbiased jurors." WASH. CONST., art. I, § 22; *State v. Momah*, 167 Wn.2d 140, 152, 217 P.3d 321 (2009). The Sixth Amendment to the United States Constitution also guarantees the right to a fair trial by impartial jurors. *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961). We review constitutional questions de novo. *State v. Siers*, 174 Wn.2d 269, 273-74, 274 P.3d 358 (2012).

In *Mach*, the Ninth Circuit held that a prospective juror who was a social worker had tainted the entire jury venire with her responses to questions from counsel and the court.[4] 137 F.3d at 631-33. The defendant was charged with sexual misconduct with a minor and, in response to

---

[4] Mach's conviction was of an Arizona offense in Arizona state courts. The Ninth Circuit's review was of the district court's denial of a habeas corpus petition and its decision was based on federal Sixth Amendment law.

questions, the prospective juror stated that she "would have a difficult time being impartial given her line of work, and that sexual assault had been confirmed in every case in which one of her clients reported such an assault." *Mach*, 137 F.3d at 632. Addressing further questions from the court, the prospective juror confirmed this opinion three additional times and also stated that she had taken courses in psychology and had worked "extensively" with psychologists and psychiatrists on these issues. *Mach*, 137 F.3d at 632.

> The Ninth Circuit relied in particular on the fact that the prospective juror
>
> (a) . . . had a certain amount of expertise in this area (she had taken child psychology courses and worked with psychologists and psychiatrists; she worked with children as a social worker for the state for at least three years); and (b) [made] four separate statements that she had *never* been involved in a case in which a child accused an adult of sexual abuse where that child's statements had not been borne out.

*Mach*, 137 F.3d at 632-33. Relying on these considerations, the Ninth Circuit concluded that "[a]t a minimum," when the defendant moved twice for a mistrial, the trial court should have at least conducted further voir dire and because the court did not conduct further voir dire, the court presumed that "at least one juror was tainted" by the prospective juror's statements. *Mach*, 137 F.3d at 633.

Here, the facts are distinguishable from *Mach* for at least two reasons because (1) no prospective juror professed any expertise about these cases, and (2) none of the prospective jurors in this case stated multiple times that, in their experience, children who are sexually abused never lie about their abuse.[5]

---

[5] Another significant difference between *Mach* and this case is that in *Mach* the defendant moved for a mistrial twice explaining its concerns about "the effect [the social worker's] statements had on the other panel members" to the court. 137 F.3d at 632. Here, because there was no objection,

6

First, unlike the social worker in *Mach*, here there were no jurors claiming expertise. Although at least two of the prospective jurors were teachers and one was an elementary school principal, and each of these prospective jurors admitted that they feel more instinctively protective of children, none of them claimed to speak authoritatively about whether a child is being truthful when she alleges that she is a victim of molestation. Therefore, the Ninth Circuit's concern about a prospective juror with more credible, authoritative knowledge tainting the rest of the venire is not present here.

Secondly, none of the prospective jurors stated multiple times that, in their experience, child molestation victims never lie about being molested. Most jurors were merely questioned about their experiences with child molestation and asked if they could remain impartial. Some jurors admitted to a potential bias, most said that they thought that they could apply the court's instructions impartially, and two prospective jurors asked for individual voir dire, preferring not to talk about their experiences in front of the rest of the venire. Even juror no. 54—the prospective juror whose statements Strange identifies particularly—said only that he thinks child molestation is "not an easy accusation to make" and that, in his limited experience, people do not make accusations of molestation "for no reason." 1A RP at 72. But juror no. 54's statement is different from the social worker's in *Mach* because he qualified his statement, prefacing it by saying, "I don't have a ton of experience." 1A RP at 72. In contrast, the social worker in *Mach* relied on her experience and her credentials to add weight to her much more unequivocal claim that victims of

---

the trial court had no opportunity to consider whether any of the prospective jurors' statements might have compromised the jury's ability to be impartial.

child molestation never lie. 137 F.3d at 632-33. Because *Mach* is factually distinguishable, we conclude that *Mach* does not control the outcome here.

We agree with the State and hold that Strange received a fair trial by an impartial jury.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Strange argues that his trial counsel was ineffective because he failed to object to the admission of a video recording of Detective McDaniel's interview of Strange. Because trial counsel's failure to object was a legitimate trial tactic, it cannot be said that Strange's trial counsel's performance was deficient. Therefore, his claim for ineffective assistance of counsel fails.

### A. STANDARD OF REVIEW

In order to prove ineffective assistance of counsel, Strange bears the burden to prove that

> (1) defense counsel's representation was deficient, *i.e.*, it fell below an objective standard of reasonableness based on consideration of all the circumstances; and (2) defense counsel's deficient representation prejudiced the defendant, *i.e.*, there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different.

*State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). We need not consider both prongs of this test if the defendant fails to prove either one. *Strickland v. Washington*, 466 U.S. 668, 697, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). We apply a strong presumption that trial counsel was not deficient and we do not consider matters outside the record. *McFarland*, 127 Wn.2d at 335.

Where a defendant claims ineffective assistance of counsel for his trial counsel's failure to object, he must also prove that the decision not to object was not a legitimate trial tactic. *State v. Hendrickson*, 129 Wn.2d 61, 79-80, 917 P.2d 563 (1996). "If defense counsel's trial conduct can

8

be characterized as legitimate trial strategy or tactics, then it cannot serve as a basis for a claim that the defendant did not receive effective assistance of counsel." *State v. Lord*, 117 Wn.2d 829, 883, 822 P.2d 177 (1991). We apply a strong presumption that trial counsel rendered adequate assistance and "made all significant decisions in the exercise of reasonably professional judgment" and the reasonableness of counsel's performance must be performed in view of all of the facts and circumstances of the case. *Lord*, 117 Wn.2d at 883. In particular, "[t]he decision whether to object is a classic example of trial tactics, and only in egregious circumstances will the failure to object constitute ineffective assistance of counsel." *State v. Kolesnik*, 146 Wn. App. 790, 801, 192 P.3d 937 (2008).

B. NOT OBJECTING TO THE VIDEO WAS A TRIAL TACTIC, NOT DEFICIENT REPRESENTATION

Strange argues that Detective McDaniel's statements were improper opinion testimony because they were offered to encourage the jury to rely on the detective's opinion that Strange was lying. Even assuming that Detective McDaniel's statements were improper opinion testimony, Strange must prove that his trial counsel's failure to object was not a legitimate trial strategy. The State argues that trial counsel's failure to object was a legitimate trial tactic because it permitted Strange to put on his defense without having to testify at trial. Specifically, the State argues that Detective McDaniel asked Strange "every reasonable question," that Strange defended himself and maintained his innocence despite Detective McDaniel's "disbelief," and that the jury saw how Strange reacted to tough questions. Br. of Resp't at 25. We agree with the State and hold that, even assuming that Detective McDaniel's statements were irrelevant or improper opinion testimony, Strange's trial counsel's decision not to object was a legitimate trial tactic.

9

In *Kolesnik,* the defendant was charged with first degree assault, and we held that trial counsel's failure to object to an expert witness's testimony that the defendant had anti-social personality disorder and feels no remorse for his actions was not ineffective assistance of counsel. 146 Wn. App. at 796-97, 801-02. We held that the failure to object was not deficient representation because trial counsel relied on the expert's testimony to explain the defendant's mental health and the defendant explicitly told the court he agreed to the expert's proposed testimony. *Kolesnik,* 146 Wn. App. at 801-02.

Here, Strange argues that his trial counsel was ineffective because he failed to object to Detective McDaniel's statements during his interview with Strange. But playing the entire video at trial had legitimate, strategic purposes: Strange presented his defense without having to testify at trial, without being subjected to cross-examination by the prosecution, and the jurors saw how he reacted to tough questioning. Like in *Kolesnik,* Strange's trial counsel here relied on the defense that Strange put forth in his interview with Detective McDaniel, arguing that the sexual contact element was not met because J.M. asked Strange to show her how to do a breast exam. Not objecting to the additional, more aggressive questioning during his interview with McDaniel permits the jury to see how Strange responded to tough questions about his behavior. Instead of calling Strange to testify at trial, his trial counsel, presented with a tape of the interview, could have reasonably decided to allow the jury to see Detective McDaniel testing Strange's story and his credibility. Strange's trial counsel may have determined that the version of Strange's defense from the interview was sufficiently convincing and, thus, preferred the interview to the unpredictable results of questioning from the prosecutor at trial.

10

Although Strange never suggests redacting the video, the State is also correct that, even if Strange's trial counsel had objected and requested that the video be redacted, some of the context of Strange's responses would be lost. There is also a risk that significant redactions might force the State to forego the video completely, requiring Strange to testify in order to present his defense at trial. It is Strange's burden to demonstrate that his trial counsel's failure to object to the admission of Detective McDaniel's statements "fell below an objective standard of reasonableness based on consideration of all the circumstances." *McFarland*, 127 Wn.2d at 334-35. His argument that "there was no possible tactical reason for the defense attorney to sit mute and fail to object" is insufficient to meet that burden in light of the State's arguments that playing the video, unredacted, allows the jury to see and to weigh Strange's defense, in context, without requiring him to testify in court. Br. of Appellant at 24.

Because allowing the admission of the video interview was a legitimate trial tactic, trial counsel's performance was not deficient. Because failure to prove either prong defeats an ineffective assistance of counsel claim, we hold that Strange's claim for ineffective assistance of counsel fails.

### III. No *PETRICH* INSTRUCTION REQUIRED

Strange argues that the trial court violated his right to a unanimous jury verdict on the second degree child molestation charge. He asserts that the court erred when it failed to give a *Petrich* instruction after the State argued that he molested J.M. both when he "showed her how to perform a breast exam" and when he touched her buttocks. Br. of Appellant at 27. We disagree.

A. STANDARD OF REVIEW AND RULES OF LAW

We review the adequacy of jury instructions de novo. *State v. Pirtle*, 127 Wn.2d 628, 656, 904 P.2d 245 (1995). Under the Washington and United States Constitutions, a criminal defendant is entitled to a unanimous jury verdict rendered by an impartial jury. WASH. CONST. art. I, § 21; U.S. CONST. amend. VI; *State v. Beasley*, 126 Wn. App. 670, 682, 109 P.3d 849 (2005). Where the State offers evidence of multiple acts that could each form the basis for one charged crime, either (1) the State must choose which of the acts it relied on or (2) the court must give a *Petrich* instruction to the jury requiring them to agree on a specific criminal act. *State v. Bobenhouse*, 166 Wn.2d 881, 893, 214 P.3d 907 (2009).

A violation of a defendant's right to a unanimous verdict is constitutional error. *Bobenhouse*, 166 Wn.2d at 893. Where the error is constitutional, the State bears the burden to prove the error was harmless beyond a reasonable doubt. *State v. Vander Houwen*, 163 Wn.2d 25, 39, 177 P.3d 93 (2008).

A defendant commits second degree child molestation when he "has, or knowingly causes another person under the age of eighteen to have, sexual contact with another who is at least twelve years old but less than fourteen years old and not married to the perpetrator and the perpetrator is at least thirty-six months older than the victim." RCW 9A.44.086(1). "Sexual contact" is defined as "any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desire of either party or a third party." RCW 9A.44.010(2).

B. THE STATE CHOSE TO RELY ON ONE ACT OF MOLESTATION

Here, the State solely argued that touching J.M.'s breasts amounted to an act of child molestation. In its opening statement, the State claimed that Strange "is charged with child

12

molestation in the second degree for touching [J.M]'s breasts when she was twelve years old." 1B RP at 202. J.M.'s testimony was also focused on Strange's offer to perform a breast exam. She testified that he offered to give her a breast exam and that he touched both of her breasts with his hands for three to five minutes after pulling up her shirt. J.M. testified that it did not hurt but that it felt "[n]ot right" and that Strange stopped touching her breasts when she told him that she thought her mother was home. 1B RP 228. J.M. also confirmed that she and Strange had not discussed cancer prior to his offer to do an exam and that Strange's concern about breast cancer and, thus, the need to do an exam was unexpected.

The State also argued in its closing that the breast touching was the act of sexual molestation. It began its closing argument by summarizing the case:

> I started yesterday by telling you this was a simple and straightforward case. And, it has been. All you need in this case is your common sense. The State presented evidence that the Defendant touched [J.M.]'s breasts . . . . The only question you have before you is, was this done for the purposes of sexual gratification?

1C RP at 448. The State continued to explain the elements of each charge and concentrated heavily on the definition of "gratifying sexual desire." 1C RP at 450; RCW 9A.44.086(1), .010(2). The State emphasized seven examples of Strange's behavior to support the conclusion that the ultimate act of child molestation—touching J.M.'s breasts—was for the purpose of gratifying sexual desire: "[l]ook at everything together with that idea and with all those seven things in mind and go to the night that she was talking about the breast exam." 1C RP at 453. The State did not suggest that any contact, other than the breast touching, was the basis for the sexual contact element of the molestation charge.

In its rebuttal, the State again referred to the seven other instances of inappropriate behavior with J.M. as "[g]rooming" in preparation for the night when Strange offered to give her a breast exam. 1C RP at 476. The State did not mention Strange touching J.M.'s buttocks.

The State mentioned Strange touching J.M.'s buttocks only a couple of times. It elicited testimony from J.M. directly only once in reference to the fact that Strange "touch[ed] [her] butt when he massaged" her. 1B RP at 241. In the recording of his interview with Strange, Detective McDaniel asked whether, when Strange tucked J.M. into bed at night, he would "touch her rear end and she would roll over." 1C RP at 371. Strange points to these two comments alone to support his argument that "it was well within the province of some of the jury members" to conclude that either the breast touching *or* the buttocks touching could establish the child molestation that the State alleges. Br. of Appellant at 28. But these stray comments were offered as evidence that Strange touched J.M.'s breasts for the purpose of sexual gratification and not as evidence of the sexual contact. Finally, the State also mentioned J.M.'s buttocks during its explanation of the "sexual contact" element of child molestation when it offered a list of "intimate parts" that included "[b]utt, lower torso, upper chest, places that swimsuits would cover." 1C RP at 450. This, likewise, does not overcome the fact that the only "intimate part" the State argued that Strange touched was her breasts.

In the context of the State's opening statement, the testimony it elicited at trial, and its closing and rebuttal, it is clear the State chose to rely on the touching of the breasts to support the sexual contact element of the child molestation charge. Thus, no *Petrich* instruction was necessary.

No. 45607-9-II

Affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, C.J.

We concur:

BJORGEN, J.

SUTTON, J.

15